UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br><br>)<br><br>)<br>v.                                                    )<br><br>)<br><br>)<br>KEVIN AMELL,                                 )<br><br>)<br>Defendant.                         )<br><br>) | Criminal No. *17CR 10101*<br><br>VIOLATIONS:<br>15 U.S.C. §§78j(b) and 78ff and<br>17 C.F.R. §240.10b-5 (Securities Fraud)<br>18 U.S.C. §981(a)(1)(C) and<br>28 U.S.C. §2461 (Criminal Forfeiture) |

## INFORMATION

The United States Attorney charges that:

### General Allegations

1.      At all times material to this Information, the defendant, KEVIN AMELL, was a resident of Massachusetts.

2.      At all times material to this Information, AMELL was a Vice President and Options Portfolio Manager at a major asset management firm based in Boston, Massachusetts ("Firm A"). In that role, AMELL was responsible for trading options for Firm A, and specifically for trading options in the funds managed by Firm A.

3.      An "option" is a type of security that gives the holder of that option the right to buy or sell a certain number of shares at a set price (the "strike price") by a certain date.   Specifically, a "call" option gives the holder the right, but not the obligation, to buy shares at a later date.   A "put" option gives the holder the right, but not the obligation, to sell shares by a later date.   One

1

option or "option contract" gives the holder the right to buy or sell 100 shares of the underlying security.

4.      Buyers and sellers in the options markets provide price quotes.   Specifically, buyers identify the price that they are willing to pay for a particular option (known as the "bid" price) and sellers identify the price for which they are willing to sell a particular option (known as the "ask" price).   The difference between the "bid" price and the "ask" price is the "spread."

5.      Given his position at Firm A, AMELL had visibility into the options market.   He could see the buy and sell orders for a particular option at a particular time.   As a result, AMELL could see the "spread," or the price buyers were willing to pay for the option and the price for which sellers were willing to sell the option at any given point in time.

## The Fraud Scheme

6.      AMELL engaged in a scheme to defraud Firm A, and the funds managed by Firm A (collectively, "Firm A"), by causing Firm A to sell options to AMELL at prices below the price at which any other market participant was willing to sell at that point in time.   AMELL then sold the options he had purchased from Firm A at higher prices, thereby profiting on the spread at the expense of Firm A.   In furtherance of the scheme, AMELL also, on occasion, purchased options at a lower price and then immediately sold them to Firm A at a higher price.

7.      Specifically, AMELL placed orders from his personal brokerage accounts to buy specific options at a specific price and, within seconds, placed orders on behalf of Firm A to sell the same options at the same price.   By controlling the prices and the timing of the sales in this way, he guaranteed that he could buy the options sold by Firm A himself.   He then, within a very

short time frame, sold the options to third parties at a higher price—a price that, as AMELL knew, could have been realized by Firm A.

8.      In some instances, AMELL purchased options in his own brokerage accounts and then immediately sold them to Firm A at a price higher than other market participants were willing to pay.

9.      Between December 2014 and February 2017, AMELL engaged in more than 250 such trades.  During that time, he made more than $1.9 million in gross profits selling options that he purchased from Firm A at artificially low prices and selling options to Firm A at inflated prices.

10.     For example, on or about November 21, 2016, AMELL bought Biogen, Inc. (BIIB) call options with a strike price of $342.50 from Firm A and almost immediately sold them at a profit as follows:

a.      At 2:29 pm, AMELL placed an order in his personal brokerage account to buy 200 BIIB call option contracts for $6.50 per contract.

b.      At the same time—2:29 pm—AMELL placed an order for Firm A to sell 275 call option contracts for $6.50 per contract.

c.      Approximately .8 seconds later, AMELL's personal brokerage order was executed, resulting in his purchase of 200 of the call option contracts sold by Firm A for $6.50 per contract.

d.      At 2:41 pm, AMELL offered to sell 50 of his newly acquired option contracts for $7.70 per contract.   AMELL almost immediately sold all 50 contracts for a profit of $6,000.

e.      At 2:45 pm, AMELL offered to sell another 50 of his newly acquired option contracts for $7.70 per contract.   AMELL almost immediately sold all 50 contracts for a profit of $6,000.

f.      At 2:56 pm, AMELL offered to sell another 50 of his newly acquired option contracts for $7.80 per contract.   AMELL almost immediately sold all 50 contracts for a profit of $6,500.

g.      At 3:11 pm, AMELL offered to sell the remaining 50 BIIB contracts at a price of $7.80.   Amell almost immediately sold all 50 contracts for a profit of $6,500.

h.      AMELL made a total profit of $25,000 in the course of 42 minutes by causing Firm A to sell him BIIB option contracts at a price lower than the price other market participants were willing to sell their contracts.

11.      As another example, on or about May 26, 2016, AMELL purchased S&P Index (SPXW) call options with a strike price of $2,090 and then almost immediately sold them to Firm A at a profit as follows:

a.      At 10:02 am, AMELL purchased 200 SPXW call option contracts in his personal brokerage account at $5.30 per contract.

b.      At 10:12 am, AMELL placed an order in his personal brokerage account to sell all 200 of his newly acquired SPXW call option contracts for a price of $5.60.

c.      Also at 10:12 am, AMELL placed an order for Firm A to purchase 290 SPXW option contracts for $5.60.

      d.     Firm A thus immediately purchased all 200 of AMELL's newly acquired SPXW option contracts for $5.60 per contract, for a profit to AMELL of $.30 per contract, or $6,000 in just over ten minutes.

      12.     In light of his position at Firm A, AMELL was required to identify all personal brokerage accounts to the Firm and also to disclose his employment to any brokerage firms he used for personal trading.   Among other things, these disclosure requirements enable brokerage firms to send trading confirmations to employers in the securities industry, such as Firm A. This information, in turn, allows firms to monitor trading by their employees and detect fraud schemes like AMELL's.   AMELL did not make the required disclosures, thus enabling him to conceal his scheme from Firm A and from the brokerage firms he used to engage in his personal trades.

## COUNT ONE
### Securities Fraud
### (15 U.S.C. §§ 78j(b) and 78ff(a))

13.     Paragraphs 1 - 12 are re-alleged and reincorporated as if fully set forth herein.

14.     Beginning no later than December 2014 and continuing through at least February

2017, in the District of Massachusetts and elsewhere, the defendant,

### KEVIN AMELL,

knowingly and willfully, by the use of means and instrumentalities of interstate commerce, the

mails, and the facilities of a national securities exchange, directly and indirectly used and employed

manipulative and deceptive devices and contrivances in connection with the purchase and sale of

securities, in contravention of Rule 10b-5 (17 C.F.R. Section 240.10b-5) of the Rules and

Regulations promulgated by the Securities and Exchange Commission, and did (a) employ a

device, scheme and artifice to defraud, (b) make untrue statements of material facts and omit to

state material facts necessary in order to make the statements made, in light of circumstances under

which they were made, not misleading, and (c) engage in acts, practices and courses of business

which would and did operate as a fraud and deceit upon any person, to wit, Firm A and the funds

managed by Firm A, through the options trading scheme set forth above.

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a), and Title 17,

Code of Federal Regulations, Section 240.10b-5.

## FORFEITURE ALLEGATION
### 18 U.S.C. §981(a)(1)(C) and 28 U.S.C. §2461

The United States Attorney further charges that:

15.     Upon conviction of the offense in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5, set forth in Count One of this Information,

### KEVIN AMELL,

defendant herein, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the commission of such offense.  The property to be forfeited includes, without limitation:

a.      $758,000 in United States Currency provided to the Federal Bureau of Investigation on or about March 27, 2017; and

b.      a forfeiture money judgment equal to the proceeds obtained as a result of the offense.

16.     If any of the property described in Paragraph 15, above, as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), as a result of any act or omission of the defendant:

a.      cannot be located upon the exercise of due diligence;

b.      has been transferred or sold to, or deposited with, a third party;

c.      has been placed beyond the jurisdiction of the Court;

d.      has been substantially diminished in value; or

    e.      has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of the property described in Paragraph 15 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

WILLIAM D. WEINREB
Acting United States Attorney

By: _____

SARAH E. WALTERS
STEPHEN E. FRANK
Assistant U.S. Attorneys

Dated: April 24, 2017